Good morning, Your Honors. David Rosenfeld on behalf of the Union, Local 1877. I'd like to reserve five minutes for rebuttal. Sure. Aramark never offered any evidence to demonstrate that any of these workers were documented, undocumented, authorized, unauthorized, or anything in the hearing. All that they offered was that they'd gotten some information that the Social Security numbers of these workers didn't match. That information actually didn't come from the Social Security Administration. It actually came from a self-audit that they had done with the Cooperation and Internal Revenue Service. The arbitrator probably found a fact which really isn't subject to review in this Court, that there was no evidence that a single worker was undocumented and unauthorized to work. And 20 years ago, when the Supreme Court addressed this question in the Misko case, which was decided just before this Court heard en banc the Stead Motors case, the Misko Court said that the parties had agreed that the arbitrator could find the relevant facts, or the facts that the arbitrator determined to be relevant. And Arbitrator Marshall found two or three times in his opinion that there was no evidence that any of these workers were undocumented. As a result, he ordered them reinstated. That fact, that they were undocumented, is really not subject to review under Misko, because Misko says clearly that the facts that follow the arbitrator are not subject to review. So there's no evidence in this record, one bit of evidence, that these workers are undocumented. The only bit of evidence is the fact that Aramark had some information that faced some Social Security mismatched information. Plus, that employees didn't go and get it rectified when it was called to their attention. They didn't get it rectified, but that's proof of nothing, because there are lots of reasons why they didn't. In this case, the employer's efforts, if I can use that term advisedly, to have them rectified, were in violation of the agreement with the union, and as found by the arbitrator, were unreasonable, unfair, and discriminatory. And it's kind of self-obvious why that was true. And that is that they were the company implemented a policy that was dated 2005, and the arbitrator said, you know, we can't even tell that that policy was in effect in 2003 when these events occurred. The policy which they offered in evidence, the arbitrator even had some doubts, existed in 2003. We know that from the arbitrator's decision that they were given 7 to 10 days to straighten the problem out. We know that the letter actually said that you have three working days to straighten the problem out. We know the company, or at least Ms. Noe Evans' company, actually followed its own policy, which it implemented without the agreement of the union, which was to, first of all, verify internally whether there was a mismatch, and if so, was its records at fault. Ms. Noe Evans' company then took the next step required by even its 2005 policy, allegedly implemented in 2003, which was that once you get some mismatch concerns, you've got to go to the employee and have the employee check with your own records. And then it gave them three business days, at least the letter said you got three business days, although the employer didn't actually terminate them for a few days later, to straighten out. All this arbitrator finds is unreasonable. And there's another fact, which is, I think, absolutely critical to the unreasonableness of the employer's position. It was unlawful. Because what the employer did was say to these people, you have to go get a new Social Security card or make application for a new Social Security card. Now, as this Court is well aware, under IRCA, employees have to provide documentation of their identity and employment status when they first deploy the I-9 form. All these workers have done that. Aramark had accepted it. And the statute goes on to say that there are certain documents which are acceptable, and it is the employee's choice which documents to provide. There are certain documents acceptable that prove both identity and work status, and there are other documents which prove only identity, and there are other documents which prove only work status. Aramark, illegally, this is a form of document abuse, said to these workers, you have to get a new Social Security card or prove that you applied for a new one. And IRCA is very clear that for work authorization purposes, you can either prove your work authorization by a Social Security card or, the statute says, by other documents authorized by the Attorney General. The Attorney General issued regulations listing some eight or ten other documents which can be used to prove only identity, I mean, only work authorization status. So their demand in their letter would say, you've got three business days to go either get a new Social Security card or get to prove to us you're applying for a new one was unlawful because the statute says that. Ginsburg. What about the tax law? Does that require the employer to give the Internal Revenue Service the Social Security number of its employees? Yes. And what the company was doing under these circumstances, or under these circumstances, was simply getting that information to the IRS and then using that for no matter. The IRS says, and this is true in 2003 and still true today, the IRS says, the Social Security Administration says, the Office of Special Counsel which administered this law all says that the Social Security number, whether it's correct or incorrect, matched or not matched, is not a statement in any respect of immigration status. That was the law at that time. The arbitrator found that was the law and specifically found that the documents that Aramark relied upon made it plain that the information which Aramark had did not speak to immigration status. All it did was say there was a number problem. And that was it. And the IRS actually doesn't impose any penalties on employers for mismatch unless they go through this much more elaborate procedure, which they never did in this particular case. So all Aramark had was that information. So the arbitrator found, look, your policy was wrong. It was implemented improperly. It was unfair. It was discriminatory. And there are lots of other reasons why it was – I mean, there were several other reasons he found it was unfair. But primarily from the union's point of view, had they sat down with the union and negotiated their way of dealing with these problems, the arbitrator would have said that would likely have said that was appropriate. But he was particularly, I think, upset that they came up in 2005 with a document that they say was applicable in 2003 that he said nobody knew about. The union didn't know about it. The workers didn't know about it. So those factual findings, A, that there was no evidence, people are undocumented. The arbitrator's conclusion is the state of the law, which, again, is subject to a very narrow review in this Court. I mean, even this Court has said that when reviewing errors of law, that's not a ground to set aside an arbitration award. Using that standard, there's really no review of this arbitrator's decision, and the Court below was wrong in questioning. Now, what's interesting about this case is Ehrmacht has never asserted, at least never asserted in the pleadings, never asserted the arbitrator that they could prove one single worker was undocumented. When they sought to vacate the award, they said in their pleadings that they – they sought that it be vacated on the ground that the employees failed to comply with their, quote, reasonable or measured policy to deal with this no-match information. The arbitrator found that it wasn't reasonable, fair. It was discriminatory. It wasn't negotiated with the union. It violates the law. That's not a finding which was subject to review by the Court below, and certainly not by this Court in light of Stead Motors as applying NISCO. And for those reasons, it seems to us that the record at this time discompels that they're not finding that the decision could not be vacated. And this Court has been very clear in Stead Motors and since then that in order to vacate a word of this nature, there has to be an explicit, well-defined and dominant public policy. At this time, there was no explicit, well-defined policy saying because your social security number doesn't match, you've got to be fired. Now, I would concede that if this was a non-union workplace, where employees were at will, Aramark could walk in probably and say to a group of workers, we've got a no-match information from some source, we don't want the hassle, you're all fired. But no reasoned employer would do that, certainly in Los Angeles, because you're facing the other aspect of IRCA, which says you can't act in a discriminatory manner, because it's quite clear that you're going to end up with a national origin problem. So employers have to find ways to kind of navigate these problems, and Aramark far missed the mark, because there were a lot of other things they could have done, which they probably could have sustained in the arbitrator's view, but didn't do it. Sotomayor Well, probably had they gone to the union and said, we need to develop a means of resolving no-match life. Something you negotiate. We pointed out in the brief, that's a mandatory subject of bargaining. And they could have, for example, proposed an arrangement whereby if they got no-match information, they would then go to the union and say, we've got this, let's give the employees a reasonable length of time to resolve it. Sotomayor 90 days, like the regulations? Sotomayor Well, keep in mind that every one of these workers had already proven their identity and work status, and Aramark had accepted it. Now, it's theoretically possible that the union and the employers said, you know, we won't take any action, because at that time, the law didn't require them to take any action. At that time, the no-match letter that the Social Security Administration used, the information provided by the IRS, and I want to just emphasize, it was not a Social Security no-match letter that was involved in this case. At that time, all the law said was that, I mean, the law didn't require employers to take any action based on this. So the union employer could reasonably get this information if you don't do anything. Or you tell the employees and let them straighten it out if they want. Roberts, suppose the Aramark had gone to an employee and said, we've got a no-match letter, says the number you gave us doesn't match their records, and the employee says, go to hell, I've given you all I'm giving you. Could they lawfully discharge that employee? Sotomayor They could lawfully if the employee was at will. Under the terms of a collective bargain agreement, the union might have an argument that there wasn't just cause because the employee already provided that information, but some arbitrators might well rule that that was just cause if the employer said to the employee, please straighten this out, and the employee said, I'm not going to straighten it out. Or the employee said, I can't straighten it out for other reasons. Roberts, he says, I'm just not going to straighten it out. I don't have to straighten it out. Sotomayor That's a matter, again, the law doesn't require that he be fired. The question is, is it illegal to fire him? Not in the at-will situation, unless there's a discriminatory reason, meaning why is that? Roberts, why wouldn't a district judge be within his rights to say, when you have an employee who refuses to provide a valid Social Security number, it's against the public policy of the United States to hire that kind of, to require the reinstatement of such an employee? Sotomayor Because it's not against the public policy to hire someone. Roberts, you told Judge Hall that you're supposed to give a lawful Social Security number in compliance with the tax laws. Sotomayor But it's not – there's nothing in the IRS code that says it's unlawful to hire someone or retain them in employment because their Social Security number doesn't match the IRS's records. There's nothing of that. Roberts, no, but that's not the question I asked you. The question I asked you is, the employer asks or says you've given me a bogus number, and the employer says, too bad. Sotomayor Because, first of all, the employer doesn't know it's a bogus number. Roberts, okay, but that's not the hypothetical here. You're not answering my hypothetical. The hypothetical I'm giving you is, we've gotten a bogus number, and we want you to fix it, and the employer says, I'm not – I'm not doing it. Sotomayor There's nothing unlawful in terminating subject to the concern that, A, it's not discriminatory, and, B, subject to some lawful termination claim where there's a contract or agreement that says you have to go through a different process. Would it violate the public policy of the United States to either the tax laws or the immigration laws to require such an employee to be reinstated? Roberts, no. Sotomayor And the difference between my hypothetical and our situation here is what? Roberts, the difference, because there really is no difference in the sense that there's no evidence that any of these workers is unauthorized to work, undocumented to work under the immigration laws. True, but they didn't fix the no-match problem. Roberts And there could be lots of very valid reasons for excluding that they're illegal. Roberts That's right, but the problem is, can a district court under Misko and Stead Motors vacate an arbitrator's decision where the company had every opportunity over the course of a year to prove that there was some evidence that these workers were unauthorized to work undocumented, made no effort whatsoever to prove it, and relied solely upon the fact that they implemented, without the union's agreement, an unfair, discriminatory, and unlawful policy, and the workers failed to comply with that? For example, Your Honor, if I can turn your hypothetical. Supposing they went to the worker and said, we have a bogus social security number. You better go get a new social security card within the next three days. That would have been an unlawful demand because, Urquhart says, you can't do that. You can't condition employment upon proving identity or work authorization to a new social security card because there are alternative ways of proving work authorization. Now, I understand that as cases like this drag on, somebody's going to say, well, why don't the workers just go fix it? That would be the easy solution. The easy solution in this case would have been for Aramark to have implemented an appropriate, correct employer policy. Most employers have done it, implemented, give workers chances to resolve these problems, worked with the union. They didn't do it, and they never, ever attempted to prove that any of these workers were undocumented. There's not a bit of evidence in this. The only thing the employer did at the arbitration hearing was have somebody testify about some hearsay about a statement that was undated. The arbitrator wouldn't accept it, struck it. They're not contesting that decision by the arbitrator. And here they're coming back now and at this they went to the district court. They're before this Court, trying to shift the burden back to the individuals when, in fact, this problem was of their own creation. I don't want to say it was of their own creation, but this situation was of their own creation because as the arbitrator found their policy was unfair and reasonable, it wasn't negotiated, it violated IRCA, it had all sorts of problems in it. And these workers, you'll remember that the arbitrator specifically found that when the union filed a grievance, the employer responded by saying, we're not reinstating them, we'll never reinstate them. Now, under that circumstance, why should workers then or later take any effort to straighten this problem out, even if they wanted to? Let's wait and get the arbitrator to rule on it and put us back to work. Let's stand in solidarity with the union because, just to conclude, so I can say this in time of rebuttal, I think what the Court below presumed was stereotyping each one of these 33 and assume they're all undocumented, when there wasn't proof that a single one couldn't work. The employer had every chance in the arbitration to prove it. That fact was found. NISCO instead says that fact is not revealable in arbitration proceeding. These workers were entitled to be reinstated with back pay. Thank you, Mr. Rosenthal. Good morning. May it please the Court. I am R.J. Hendricks with Morgan Lewis & Bacchus on behalf of Appellee. Let me start with the basic premise regarding the existence of a dominant, well-existing public policy with respect to these issues, both in terms of the tax law, the requirement of employees to have Social Security numbers for the proper processing of payroll and other sort of benefits, immigration law, the prohibition of an employer to hire or even to maintain the employment of an employee who is not a documented worker. It really is indisputable that there does exist a well-defined policy in the United States that would support the decision that took place at the Aramark facility. Now, the real issue that the union is trying to raise here is the question of proof, that in some respect there was insufficient proof that was presented to the arbitrator. I'm going to address that in two different ways. First, if you re-examine the arbitration award itself, the opinion letter itself, the arbitrator at the end makes a very curious statement. He says, and this is in the record at 42, after acknowledging that we presented arguments regarding the public policy issues, okay? He says, the arbitrator's reading of those case laws and publication leads the arbitrator to believe under the circumstances of this case, AFS has an all probability of good faith defense to any charge it knowingly continued to hire unauthorized workers after receiving notification of SS mismatch and no match letters. The fact of the matter is that it is odd that this arbitration decision even contemplates the notion that in fact this is still going to be an issue for us. If these workers are reinstated and if back pay is provided for them. The very fact that they, that this arbitration work includes that passage is itself an implicit acknowledgment that the agencies could conclude, in fact, that these workers were not documented and were not properly authorized to work. Let's go to the issue of proof. Counsel seems to distinguish the issue of direct proof versus the issue of constructive or circumstantial proof. And we did present during the arbitration circumstantial evidence that these workers were not properly documented. Now contrary to all of the suggestion, we did not act based upon simply the mismatch letter. We did implement the process at the facility that allowed individuals to, first we checked our own records to see whether or not we had made the mistake. So we didn't jump to any sort of conclusions. Then we implemented a process wherein we would reach out to the workers, give them an opportunity to make a decision, and then we would take steps to correct. But you know, Mr. Hendricks, the problem is you don't get to re-argue the arbitration in front of us. I mean, you made this pitch, the arbitrator heard it, he didn't buy it, and, you know, most of the time we're stuck with what they do. Well, I understand that. But what we're stuck with is an award and whether that award is going to be enforced. And I think that the district court, notwithstanding the findings of the arbitrator, has to make an independent determination as to whether that award as issued violates public policy. The information that I'm presenting is information that was presented to the arbitration of the arbitrator. And as a matter of public policy, we've attached the guidance from the Department of Homeland Security. The inference that exists and where the arbitration award is violative of public policy is in disregarding that inference. Well, it's certainly an inference that can be drawn.  There could be any number of reasons why the people didn't get the number fixed. And, you know, you arbitrate it, the arbitrator does his thing, and, you know, we don't generally set those aside. Well, the union's own expert conducted a study in connection with that. And that study found that the most reasons why you have the no match situation is because of undocumented workers. Okay, well, that makes the arbitrator wrong. It still doesn't make it reversible. But what it does is, but again, the arbitrator's finding is one issue. The district court must conduct, based upon the claims presented, an independent analysis as to whether or not that award is violative of public policy. In disregarding the inferences that we've argued, inferences supported by the Department of Homeland Security, its regulations, its analysis regarding these issues, that was violative of public policy, okay? The inferences was a proper inference. The laws are important laws. And in ignoring that, and in disregarding that, that determination is a part of what makes this decision violative of public policy. Secondarily, regardless of what the arbitrator says or does, we're going to be back at this exact same situation. Your hypothetical is perfect. In essence, that's exactly what the workers have done. They've said, we're not going to do anything, okay? So we've been put on notice that we have the Social Security no match. We've given them a mechanism to correct the no match situation. They have failed to do so. The agencies articulate that this constitutes constructive knowledge on our part. We're back in the exact same situation that we are again. And there's no obligation of the union to agree to any particular sort of program that would reconcile this. And our obligations, you know, interestingly enough, it's not going to be the union indemnifying us when we're sanctioned for this from the agencies. It's not going to be the arbitrator that's going to be indemnifying us. We are the ones in the rock and the hard place. Between an arbitrator that ignored improperly strong public policy regarding the inferences that should be reached and can be reached in the context of this. And let me clarify this as well. When you have a no match letter, the no match letter raises a fundamental question as to the identity, especially when you have people who don't correct that issue. You know, you're told this number is not reconciling with you. Here, fix it. Now, if it's really me, I can go and fix that. I can take steps to fix that. If it's not me, if I can't fix that, which is the case here, that raises fundamental questions over the identity of who we're actually dealing with. It calls into fundamental question any and all of the documentation that's been presented. And that's why the Department of Homeland Security and Secretary Chernoff has argued and made very clear, you know, when you have these no match situations, particularly where people don't correct it, as is the case here, there's a strong inference of the fact that the person's undocumented. Okay. And again, cited by the agency itself, the Department of Homeland Security, the expert used by the union in this case conducted a study and reached that same determination. So what we're dealing with here is this, and this is why courts are empowered to exercise the public policy exception in vacating a arbitration award, because they can take a look at that and say, you know something, as we look at the record that was presented, we believe that, one, there was a fundamental public policy at play here. It was a well-established dominant policy. We believe that the inferences that existed on the record were sufficient, and your disregarding of that is a fundamental undermining of the public policy. And that's what we have here. So the district court... You're not too constructively construe for a no-match letter that the person is undocumented. That's in the presence of simply the no-match letter. But the Department of Homeland Security has clarified that those sort of statements were never intended to encourage employers to take a blind eye. They've also articulated that they feel that unions have used those statements in some respect to encourage employers to turn a blind eye. We did not act simply based upon a no-match letter. You told also, I get the impression, that you cannot go back and require them to put in the documents that they initially had to put in to show that they were documented workers. Well, the issue, the question that comes up is, there are two policies. We have tax policy, we have immigration policy, and we assert both of those. But with respect to these other documents, once you have a fundamental question raised by virtue of the identity of the person you're dealing with, those other documents really aren't as probative. You need to reconcile, who are we dealing with here? And the failure of the worker to go and clarify, correct, or even take steps to correct. There's nowhere in this record indicating that the 33 that were ultimately terminated even took one step to correct the no-match issue. Okay? So you have to say you don't have to because they've already given you these documents when they were first hired, and that that was adequate. So let's walk through the scenario. You give me a set of documents saying that John Doe, this is my Social Security number, John Doe, this is my passport or driver's license or some other sort of document, and then we get information that, in fact, by virtue of the no-match, in your failure to correct that, you may not even be John Doe. You may not be John Doe. So why are we going to rely necessarily on these other documents that refer to some person that we really don't know now is you because of your failure to correct what would ordinarily would be a simple measure to correct? And that is you could even send us a letter saying I'm working on it. It's taken longer than three days, and I'm sorry I can't get it to you in that time period, but I'm working on it. I am who I say I am, and just give me a little more time. That never happened in this case. That never happened as a part of this record. What we had was basically the hypothetical presented by Your Honor, and that is we're not doing anything on this, okay? Under those circumstances, it is a reasonable and sufficient inference that exists that these people are undocumented and are not eligible to maintain their employment with us. Sotomayor, where is the reasonable time you should give them to come up with the documents? You know, I think people can debate upon what's a reasonable time. The regulations, are they proposed regulations, say 90 days? The proposed regulations do say 90 days. And again, I submit that had anyone come back to say, you know, we need more time and we didn't provide it, that would be a different sort of fact pattern. What we have here is people taking no steps at all, even within the time period allowed for them. And we believe based upon that, that is a reasonable inference and it's a sufficient inference. And again, I analyze this from two standpoints. One, I think it's an independent basis for public policy in the context of the arbitration to reverse that. I think that the public policy is expressed in the Hoffman decision. And again, in that decision, you had a situation where the company was targeting people based upon their union activities. That's not the evidence here. There's no evidence of that kind of misconduct in this case. So even in the face of that misconduct, the Supreme Court said there's still an existing policy that would preclude back pay. We submit it's the same policy that precludes reinstatement. And even though they didn't address it in that case, they had already resolved below that reinstatement would not take place. But notwithstanding the finding of the arbitrator that ordered back pay, the Court independently said no. So again, the underlying decision, we believe, is defective because the arbitrator did not reach inferences contrary to public policy. That's our position. But regardless of the arbitration, regardless of that decision, once the award is issued, there is now an independent inquiry that can take place by the district court and derivative by this court that says, you know something, we think that the inference is sufficient. We think that the failure, we think the combination of the no match and the failure to correct the no match, the failure to indicate any steps to correct the no match, particularly when 15 other employees who went through the same process were not terminated, is a sufficient inference that they're not documented. It's supported by the analysis from the agencies charged with enforcing those particular laws who cite to Ninth Circuit authority in that regard, who also cite to a study conducted by the expert of the union, who says in most instances they're undocumented. That's why you have the mismatch. What effect on that does the fact that you had a collective bargaining agreement and you didn't bargain over this particular issue? Again, our position has been that we have inherent management rights, that the agreement articulates those inherent management rights, and that was the position below. That's still our position. Regardless of that, we have an obligation to comply with law. It's not going to be the union. It's not going to be the arbitrator who's subject to the sanction. It is us. We are the ones in the rock and the hard place, and we must comply with law. And we believe that the authorities that existed then and have been emboldened now support that the agencies would make the determination that there was a sufficient constructive knowledge that we had to take the action that we did. And for the arbitrator to include in his ruling a reference to this speaks to the issue, despite anything else, that he recognized that this was and still is potentially a problem, but, you know, it's not his function to determine immigration law here. And I really don't believe that his conclusion as to what the agencies would do and whether we have a defense of good faith as to the agencies, I don't think that is controllable. That's outside of the contract. It relates to Federal law and other sorts of issues. I think the Department of Homeland Security, who is writing these statutes and giving us this guidance, saying that for the last ten years that's been their view, that there's been a confusion with some folks saying that the no-mismatch letters means you can turn a blind eye, I think there's clear policy on that. With the mismatched letter, we had a duty to investigate, based upon the failure to correct, that was a sufficient and reasonable inference that these folks were not documented. It's supported by the statutes. It's supported by the analysis. The failure of the arbitrator to take that inference violates public policy. And regardless of that, you are now the district court was presented with this issue. It ruled correctly on this issue. It should be affirmed. Thank you very much, Mr. Gershengorn. Mr. Rosenfeld. I'll just address two points. Judge Hall, you're correct that the new proposed regulations provide 90 days. The initial proposed regulations a year and a half ago proposed 60 days. They actually went considerably further than that. They say if the employer gets a specific letter from the Social Security Administration which has been redrafted to make it plain that the old letter didn't say that a no-match letter can't say anything about immigration status. It expressly said to the contrary. The new letter, which is part of the proposed regs, tells employers that a reason why there's a no-match can be immigration-related. And then the new regs give a much more elaborate policy which says you do the following. You consult your own records and make sure that they're accurate. You then consult with the employee and see if the employee can explain the problem. Then you give the employee 90 days to straighten out. You don't specify exactly what documents they have to bring in because IRCA allows various documents, and IRCA regs were just amended at the end of the year to change some of those documents. And then after 90 days, the next thing you do is you say to the employee, you haven't corrected the old number. You can come in and start over again and give us a new number. And the regs say you've got to provide some different information. You can't rely on the old. And then the regs say nothing more other than if you go through that process, DHS will not find constructive knowledge. It leaves off the other shoe. The regs don't say at that point you must fire the employee, and the regs don't say the employee is now undocumented. It simply says the DHS will not find the constructive knowledge problem. So even the regs don't require firing all the other employees. Now, what does that do? Does that take the employer off the hook? It takes the employer off the hook. The employer can now be not be fined for hiring this worker. At that point, but the practical effects is at that point, most employers will terminate employees. And in the initial regs, the government had said we won't find discrimination, and they've retooled the regs slightly, the explanation for reasons that were addressed in the district court decision. But Aramark never even tried anything. So they could terminate the employee at that point. After going through all that process. And not be found to be discriminatory when doing so. Well, not really. What happened was initially DHS, when it proposed these regs and announced them in August of 2007, said this will protect you from a discrimination claim. Judge Breyer in San Francisco enjoined the regs in part because he said you can't make that finding because you don't have, you DHS, don't have that regulatory authority. It rests with the Attorney General. So the new proposed explanation for the same regs drops that as a sort of protection. So the point is that the new regs, which were not a well-defined dominant policy in 2003 are inapplicable, but they do offer some explanation I wanted to clarify. The final point, Your Honor, Judge Silverman, is you used the correct word, stuck. That's a fair legal term in this context. And that's exactly what the Supreme Court said, contrary to what counsel says. He says you need to draw a different inference. The arbitrator doesn't have the right to consider the application of Federal law. That's contrary to Stead Motors. It's contrary to MISCO. And in Stead Motors quoting MISCO, this Court en banc said, in response to the argument which Stead Motors made, explicitly disapproving the latter endeavor, the Court, the Supreme Court said, the parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. That's the error of the Court below. Thank you. Thank you, Mr. Roosevelt. And Hendricks, thank you, too, in case this argument is submitted. We'll stand and assess for today.
judges: Hall, Nelson, Silverman